# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

BIRCHMANS PARISIAN, LLC,
individually and on behalf of itself and all
others similarly situated,

               Plaintiff,

       v.

CAL-MAINE FOODS, INC, ROSE ACRE
FARMS, INC., HILLANDALE FARMS
CORP., DAYBREAK FOODS, INC.,
VERSOVA HOLDINGS, LLC., and DOE
DEFENDANTS 1-20,

               Defendants.

Case No. 1:25-cv-14030

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Birchmans Parisian, LLC (d/b/a Lisciandro's Restaurant), individually and on behalf of all others similarly situated, brings this class action complaint against Defendants Cal-Maine Foods, Inc. ("Cal-Maine"), Rose Acre Farms, Inc. ("Rose Acre"), Hillandale Farms Corp. ("Hillandale Farms"), Daybreak Foods, Inc. ("Daybreak"), and Versova Holdings, LLC (collectively, "Versova", and with Cal-Maine, Rose Acre, Hillandale Farms, and Daybreak, collectively, "Defendants"). Plaintiff seeks treble damages, injunctive relief, and other relief, for Defendants' *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Plaintiff alleges, based on personal knowledge as to the facts pertaining to itself, on the investigation of counsel, and on information and belief for all other allegations, as follows.

## **INTRODUCTION**

1.　This case arises from a *per se* unlawful conspiracy among Defendants, the dominant producers of conventional shell eggs ("Conventional Eggs" or "eggs") in the United States, to fix and raise prices to artificially high levels throughout the United States, including in the Northern District of Illinois.

2.　The Chicago field office of the Antitrust Division of the United States Department of Justice ("Chicago DOJ") is investigating major Conventional Egg producers. The Chicago DOJ has subpoenaed, including by way of a Civil Investigative Demand, at least the two largest Defendants—Cal-Maine Foods and Rose Acre Farms.

3.　Cal-Maine Foods, a publicly held company, first disclosed its involvement in an April 2025 filing with the United States Securities and Exchange Commission: "In March 2025, the Company received a civil investigative demand in connection with a widely publicized investigation by the Antitrust Division of the Department of Justice into the causes behind nationwide increases in egg prices.  The Company is cooperating with the investigation."

4.　The Chicago DOJ has also formally requested multiple other Conventional Egg

producers to preserve documents about pricing, production, and bird flu, as well as communications with Expana, which owns and controls the Urner Barry pricing service.

5.     Defendants turned an avian flu outbreak and inflationary conditions into an opportunity to extract egregious and unprecedented profits at the expenses of members of the Class (as defined below) by fixing, raising, and maintaining supra-competitive prices for Conventional Eggs. In doing so, Defendants followed the cynical but for them ultimately successful strategy to "never let a good crisis go to waste," enriching themselves and violating antitrust laws in the process.

6.     This is not the first time the major Conventional Egg producers have conspired to fix and raise Conventional Egg prices. In 2023, Cal-Maine and others were found liable for price fixing by a jury in the Northern District of Illinois. The jury awarded the three opt out Plaintiffs damages trebled to $53 million. *See Kraft Foods Glob., Inc. v. United Egg Producers, Inc*., No. 11-CV-8808, 2024 WL 4346418, at *1 (N.D. Ill. Sept. 30, 2024) (Seeger, J.).

7.     The Conventional Egg market is ripe for collusion. Conventional Eggs are a commodity product with relatively inelastic demand and with an increasingly concentrated group of large producers. The top U.S. Conventional Egg producer, Cal-Maine, is a market leader and has a 20% market share.  During the Class Period, as egg prices rose, Cal-Maine has enjoyed massive increases in its profits and its stock price.

8.     Beginning in January 2022, there was an Avian Influenza ("AI") outbreak. This was by no means the first experience with avian flu and consumers were preconditioned to expect higher prices. Seizing this opportunity, Defendants found a convenient cover for implementing a price-fixing conspiracy to drive Conventional Egg prices to supra-competitive levels. Throughout the Class Period, Defendants have leveraged their collective market dominance and effective

control over the Urner Barry Egg Index, the industry's so-called "independent" pricing mechanism, to exploit the crisis, artificially inflating and maintaining supra-competitive prices.

9.      Defendants' unlawful conspiracy has proven highly effective. Since early 2022, egg prices have climbed significantly. The wholesale price of Grade-A, Large, White, Shell Eggs skyrocketed from approximately $0.50 – $1.30 per dozen in 2021 to $3.00 – $6.00 per dozen by the end of 2024—a more than fourfold increase. At the same time, Defendants are enjoying unprecedented profits. For example, since 2022, Cal-Maine, the only producer required to publish its financials, is reaping quarterly profits that equal or exceed its annual profits in the years just prior to the outbreak.

10.      Farm Action, a nonpartisan farmer-led watchdog, sent the following appraisal of conduct and price action in the Conventional Egg market by dominant producers to both the Department of Justice and the Federal Trade Commission:

> While avian flu has been cited as the primary driver of skyrocketing egg prices, its actual impact on production has been minimal. Instead, dominant egg producers— particularly Cal-Maine Foods—have leveraged the crisis to raise prices, amass record profits, and consolidate market power. The slow recovery in flock size, despite historically high prices, further suggests coordinated efforts to restrict supply and sustain inflated prices.

The subpoenas were served from Chicago shortly thereafter.

11.      Defendants' conspiracy has unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26. As a direct, proximate, and material result of Defendants' conspiracy, Plaintiff and members of the Class have paid artificially high prices for shell eggs. Accordingly, Plaintiff and members of the Class seek to recover treble damages, injunctive relief, and other relief as direct purchasers under the federal antitrust laws.

12.      Plaintiff demands a trial by jury in the Northern District of Illinois.

## JURISDICTION AND VENUE

13.     The Court, sitting within the Northern District of Illinois, has subject matter jurisdiction under 28 U.S.C. §§ 1331 &1337(a). The Court has federal question subject matter jurisdiction; Plaintiff brings its claim under Sections 4 & 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, for Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.

14.     The Chicago DOJ commenced the investigation of, and continues to conduct its investigation of, Defendants' price fixing conspiracy in this District.

15.     The Court has personal jurisdiction over Defendants because they purposefully directed their business activities toward this jurisdiction and had substantial contacts with this jurisdiction and because Plaintiff's claims for relief arise from the illegal acts Defendants committed within this jurisdiction as evidenced by the Chicago DOJ's investigation into Defendants' pricing activities and conduct that commenced within and is ongoing in the Northern District of Illinois.

16.     Venue is proper in the Northern District of Illinois under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22 because Defendants transacted business in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. During the Class Period, Defendants transacted business in this District, and a substantial portion of the activity at issue in this case occurred in this District.  The Chicago DOJ commenced the investigation of, and continues conduct its investigation of, Defendants for their price fixing conspiracy in the Northern District of Illinois.

17.     The Chicago DOJ is located in the Rookery Building, at 209 S. LaSalle Street in Chicago, within walking distance to the Northern District of Illinois Everett McKinley Dirksen United States Courthouse at 219 South Dearborn Street in Chicago.

## INTERSTATE TRADE AND COMMERCE

18.    During the Class Period, Defendants' conduct was and is within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in the Northern District of Illinois. Each Defendant and/or one or more of its affiliates used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to join or effectuate their conspiracy.

19.    Billions of dollars of Conventional Eggs are produced, sold, distributed, and purchased each year in interstate commerce in the United States and the goods and the payments for those goods flowed in interstate commerce.

20.    Defendants' manipulation of the Conventional Egg market had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

21.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for Conventional Eggs.

22.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of Conventional Eggs, the prices of Conventional Eggs would have been determined by a competitive, efficient market.

## PARTIES

### A.    Plaintiff

23.    Plaintiff Birchmans Parisian LLC (d/b/a Lisciandro's Restaurant) is a citizen of the State of New York with its principal place of business in Jamestown, New York. Plaintiff purchased Conventional Eggs directly from one or more of the Defendants during the Class Period and paid an artificially high price for those eggs.

**B.     Defendants**

24.     Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a Delaware corporation with its principal place of business in Jackson, Mississippi. During the Class Period, Cal-Maine sold eggs directly to purchasers in the United States, including the Chicagoland area. Such direct purchasers are members of the Class. Cal-Maine acknowledges that it ships eggs to customers in Illinois. The Chicago DOJ is currently investigating Cal-Maine for the same price fixing conspiracy alleged in this Complaint.

25.     Defendant Rose Acre Farms, Inc. ("Rose Acre") is an Indiana corporation with its principal place of business in Seymour, Indiana. Rose Acre is registered to do business in the State of Illinois. Rose Acre operates facilities located in Donovan, Illinois, which is within the Northern District of Illinois. Rose Acre also operates a facility in Germantown, Illinois that produces more than 700,000 eggs per day. During the Class Period, Rose Acre sold eggs directly to purchasers in the United States, including the Chicagoland area. Such direct purchasers are members of the Class. The Chicago DOJ is currently investigating Rose Acre for the same conspiracy alleged in this complaint.

26.     Defendant Hillandale Farms Corp. ("Hillandale Farms") is a corporation located in Kent, Ohio.  On May 12, 2025, Hillandale Farms was acquired by Global Eggs, S.à r.l., a privately held Luxembourg company, for $1.1 billion dollars and remains in operation.

27.     During the Class Period, Hillandale Farms sold eggs directly to purchasers in the United States, including in the Chicagoland area. Such direct purchasers are members of the Class. The Chicago DOJ is currently investigating the same conspiracy alleged in this complaint.

28.     Defendant Daybreak Foods, Inc. ("Daybreak") is a Wisconsin corporation with its principal place of business in Lake Mills, Wisconsin. Daybreak is registered to do business in the State of Illinois. Daybreak operates a Grant Park facility which is within the Northern District of

Illinois. During the Class Period, Daybreak acquired a smaller rival with operations in Illinois, further increasing the number of egg-laying hens that Daybreak maintained in Illinois. During the Class Period, Daybreak sold eggs directly to purchasers in the United States, including in the Chicagoland area. Such direct purchasers are members of the Class. The Chicago DOJ is currently investigating the same conspiracy alleged in this complaint.

29.     Defendant Versova Holdings, LLC ("Versova") is an Iowa corporation with its principal place of business in Sioux Center, Iowa. During the Class Period, Versova sold eggs directly to purchasers in the United States, including the Chicagoland area. Such direct purchasers are members of the Class. The Chicago DOJ is currently investigating the same conspiracy alleged in this complaint.

30.     Doe Defendants 1-20 are other individuals or entities of unknown places of residence or states or countries of incorporation who engaged in or abetted the unlawful conduct by Defendants set forth in this Complaint. Plaintiff may amend this Complaint to allege the names of additional Defendants as they are discovered.

**C.     Agents and Co-Conspirators**

31.     The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

32.     Each corporate Defendant's agents operated under the authority and apparent authority of their respective principals.

33.     Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

34.     Various persons and/or firms not named as Defendants herein may have

participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

35.     Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

36.     When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiff is alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family.

## FACTUAL ALLEGATIONS

### A.     The U.S. Egg Industry

37.     Eggs are a fundamental staple in U.S. kitchens. The U.S. Department of Agriculture has recognized eggs as "among the most nutritious foods on earth." Similarly, the American Heart Association describes eggs as "an efficient, rich source of protein and vitamins" that support healthy metabolism, liver function, and fetal brain development.

38.     Thanks to their high nutritional value and versatility in cooking, eggs remain an essential part of U.S. households. Per capita egg consumption has been steadily rising, with the average American consuming approximately 288 eggs per year in 2024.

39.     Egg production is characterized by two related sectors—the "shell egg" sector and the "egg products" sector. The shell egg sector primarily produces "table eggs" intended for immediate consumption. These eggs are typically sold in cartons to grocery stores for retail distribution to consumers. Additionally, restaurants, hotels, and other food service establishments purchase shell eggs for their operations. The shell egg sector also supplies "breaking eggs" to the egg products industry, where they are processed into various egg-based products.

40.     A growing niche within the shell egg market includes products like cage-free and

organic eggs, which typically sell at higher retail prices than Conventional Eggs. Cage-free eggs come from hens that are not confined to cages and can move freely within indoor housing, allowing for more natural behaviors. Despite increasing consumer demand for more humane production methods, Conventional Eggs remain the dominant category, representing approximately 70% of total U.S. shell egg production.

41.    In 2024, egg producers in the United States produced approximately 258 million cases—over 7 billion dozen—of shell eggs. The vast majority of U.S. egg production is consumed domestically, with only 5.5 million cases of shell eggs exported in 2024.



42.    The U.S. Department of Agriculture (USDA) enforces a standardized grading and sizing system for shell eggs to ensure consistency across the market. Eggs are classified into consumer grades—Grade AA, Grade A, and Grade B—based on specific interior and exterior quality attributes. Additionally, egg sizes are determined by weight per dozen, ranging from Jumbo to Small. These uniform standards minimize opportunities for product differentiation, meaning that a "Grade A Large" egg from one producer is virtually indistinguishable and fully interchangeable with the same grade and size from another producer.

**B.** **Shell Egg Production**

43.     Commercial shell egg production begins at large laying facilities where specialized breeds of laying hens are bred and raised. Once the layer chicks, commonly known as pullets, are hatched, they are placed in layer pens or in pullet houses.

44.     A flock begins producing eggs at 18 to 22 weeks of age. At this stage, approximately 10% to 20% of the hens have started to produce eggs. A flock's production then increases up to its peak—about 90% production—at 30 to 32 weeks of age. Production then generally decreases, and by the time the hens reach 60 to 70 weeks of age, the flock's production will drop to around 50%.

45.      Molting is a natural process for hens that usually occurs when the days become shorter during the fall. Hens will substantially reduce their feed intake, stop laying eggs, and replace their feathers.

46.     Producers can artificially induce the molting process by withdrawing or limiting food and controlling light exposure. Molting is a way for a producer to control the supply of eggs.

47.     Approximately 10 weeks after molting starts, the flock will increase back up to 50% production. Production following a molt will then peak at around 80%. This peak is short-lived, and flock production generally returns to 50% production at 100 to 110 weeks.

48.     The majority of hens are removed from production at between 100 and 130 weeks, at which time the birds are sent to a spent-hen facility. The spent hens are immediately replaced by mature pullets, creating a continual cycle of renewal.

49.     Shell eggs are usually collected on nylon belts and sent to a storage cooler or egg processing center. Eggs generally arrive at the egg processing center within 12 to 14 hours post-lay where they are washed, inspected (checked for eggshell problems, cracks, and blood spots), and then graded for packaging. At this point, eggs are either placed into cartons for sale or

separated for further processing.

50.     Following packaging, shell eggs are moved to a cooler room where they await shipment to retail outlets or food processors. Egg producers commonly deliver eggs to purchasers within one week of lay.

51.     The egg industry is largely made up of vertically integrated producers, including Defendants, who exercise significant control over every stage of production. This comprehensive oversight allows them to meticulously manage the entire production process.

### C.     The Urner Barry Egg Index

52.     Unlike other agricultural commodities such as soy, coffee, and sugar, the egg market lacks a regulated exchange where prices are transparently determined through open trading. There is an online spot market known as the Egg Clearinghouse Inc. ("ECI"), which allows farmers to sell excess inventory or purchase additional eggs to meet contractual obligations in urgent situations.

53.     Established in 1971 by Fred Rogers Adams, Jr., the founder of Cal-Maine, the Egg Clearinghouse, Inc. (ECI) has maintained close ties with the company. Adams' son-in-law, Adolphus B. Baker—Cal-Maine's Chairman since 2012—previously held the role of ECI chairman and continues to serve on its board. Although ECI operates as the main online spot market for shell eggs, it accounts for less than 5% of total egg transactions in the U.S. market.

54.     Most shell eggs are sold through long term contracts between producer firms, such as Defendants, and chain buyers, with prices being set based on weekly wholesale quotes published by Urner Barry, an industry consulting and data analytics firm. Consequently, the prices in these contracts fluctuate frequently because they are tied to changes in the Urner Barry index. This widely used pricing benchmark enables Defendants to coordinate and influence egg prices across the industry, facilitating market-wide price manipulation.

11

55.     Urner Barry, now owned by Expana—self-described as "the world's leading agrifood-focused Price Reporting Agency and global information provider"—publishes the Egg Price Current Report, commonly known as the UB Index. This report offers standardized pricing for various egg grades and sizes, with Grade A Large being the most frequently traded. Urner Barry constructs the widely used price index, claiming to derive these prices by observing the small spot market through ECI and gathering price data directly from egg producers, distributors, exporters, and buyers. Urner Barry distills these data points into "benchmark" prices in its UB Index and sells it primarily to the same entities that originally provided the pricing data information, which they, in turn, use to formulate pricing in their contracts with their customers.

56.     Specifically, Urner Barry  collects information from egg producers "via numerous channels including phone interviews, face-to-face meetings, email, instant messaging platforms, fax, and online through Urner Barry's website… Information collected includes when a transaction was initiated, what products have been traded, what levels are being bid on each product, who is bidding or offering at said level, when the product will ship, and how the product is packed."

57.     Urner Barry collects a variety of information regarding "bona fide trades," offers and bids, and other market communication by communicating directly with egg producers like Defendants.  Notably, "[o]ffering prices cannot be used to move prices upward, nor can bid prices be used to move prices downward." Urner Barry then publishes a daily retail shell egg price "quotation" that it claims reflects the information provided to it.  Throughout the Class Period, the Urner Barry reporters that cover the shell-egg market have been Karyn Rispoli, Randy Pesciotta, and Russ Whitman.

### D.     The 2022 Avian Flu Outbreak and Egg Prices

58.     Avian influenza (AI) is a common viral respiratory disease that infects all avian species. The first reported case of "fowl plague" occurred in Italy in 1878, with the first case

reported in the US in the 1920s. Based on the severity of illness, the pathogenicity of the disease is classified as either High ("HPAI") or Low ("LPAI").

59.     The 2022 avian influenza outbreak was caused by HPAI, specifically the H5N1 strain, which affected both wild and domesticated birds. The outbreak began in January 2022, when the virus was detected in wild birds in South Carolina. The epidemic first reached commercial laying facilities in February 2022, followed by 14 additional detections that month.

60.     Historically, eggs have been one of the most budget-friendly sources of animal-based protein. Before the 2022 avian flu outbreak, wholesale prices for Grade-A, Large, White, Shell Eggs ranged from $0.50 to $1.30 per dozen in 2021. However, since the onset of the epidemic in early 2022, prices have soared. That year, wholesale egg prices spiked to $1.50–$5.00 per dozen.

61.     While there was a slight decline in 2023, the trend reversed by August 2024, with prices climbing again to $3.00–$6.00 per dozen by year-end. As of March 2025, the national index for weekly egg prices reached an all-time high of $8.17 per dozen.

### E.     The Dramatic Surge in Egg Prices is a Result of Defendants' Conspiracy

#### 1.     Defendants Use the UB Index to Price Eggs and as a Scapegoat

62.     Defendants use the UB Index as the basis for their wholesale pricing in long-term contracts and will shift blame to the UB Index when challenged on their high prices.

63.     For example, in a FAQs page created by Cal-Maine in response to consumer outrage over high egg prices, Cal-Maine claimed that they had no power over pricing because their "eggs are typically priced under specific customer agreements, a majority of which are tied to the independently quoted Urner Barry egg price index, and thus only change when Urner Barry's quoted index price changes."

64.     Similarly, in response to a 2020 lawsuit filed by the New York Attorney General for alleged price gouging during the COVID-19 pandemic, Hillandale Farms stated that their

pricing approach had been "consistent for decades" and that they relied on "a third-party company, Urner Barry," a company known for market reporting in the food industry.

65.     Cal-Maine's annual SEC filings during the Class Period confirm that "the majority of conventional shell eggs sold in the U.S. … are sold at prices that take into account … quoted wholesale market prices, such as those published by Urner Barry." Based on information and belief, all Defendants contribute to and otherwise use the UB Index as the pricing benchmark for their wholesale rates in long-term contracts.

### a. Benchmark Price Inflation via Coordinated Self-Reporting to Urner Barry

66.     Because Urner Barry relies on voluntary submissions from dominant market participants to generate its widely used quotations and indexes, Defendants, the major egg producers, were uniquely positioned to influence the benchmark. By manipulating the information regarding inventory levels, asking prices, and purported transaction values, Defendants were able to construct a narrative of scarcity and heightened demand, even when underlying supply conditions did not justify such pricing. This conduct allowed them to raise the Urner Barry benchmark, which in turn elevated prices in indexed supply contracts and spot market transactions.

67.     New York's Attorney General pointed out in a lawsuit against Hillandale Farms for pandemic price gouging that the UB Index functions as a feedback loop where producers' own inputs are used to set wholesale egg prices.

68.     As U.S. Senator Jack Reed and others have noticed, "[i]ndustrial egg producers seem to be feeding the American public a phony narrative about why egg prices are so high… to force consumers and retailers to shell out more for eggs." "While the wholesale price of eggs is tied to the Urner-Barry index, the dozen largest egg producers have the ability to feed data into the index that could result in beneficial pricing for the industry," Reed added.

69.     Defendants, as major egg producers in the U.S. market, wield considerable influence over the UB price index due to their significant market presence. During the Class Period, Defendants leveraged the bird flu outbreak as a pretext to drive prices beyond competitive levels. As the Urner Barry egg price index increased, so did their prices in contracts signed with egg buyers, creating a self-reinforcing upward price spiral driven by their coordinated actions.

### b.  Defendants Dominate the UB Index

70.     Traditionally, the UB Index has been proven to not reflect the true market value of eggs, leaning more heavily toward the daily self-reported inventory data of the largest producers. In October 1984, a paper published in the Cornell Agricultural Economics Staff Paper titled "Urner Barry Shell Egg Quotes: How Good Are They?" concluded that information provided by egg producers to Urner Barry were "based principally on verbal descriptions of market conditions rather than on actual transaction prices" and that while "[s]pot quotes, ECI prices and military sales are incorporated… they are not weighted heavily by Urner-Barry." This resulted in Urner Barry quotes "drift[ing] above actual exchange prices." The paper found that Urner Barry reporters were often led by egg producers toward price stability which resulted in prices that deviated from efficient market clearing prices and pricing that adjusts upward more rapidly than downward.

71.     Defendants abused their market power to exploit bird flu disruptions and push prices, and their profits, even higher. A recent letter by Farm Action revealed that egg companies have not replaced their flocks at the same rate as they did following the 2014-2015 bird flu outbreak.

72.     Defendants' conspiracy during the Class Period is apparent in the way the so-called prevailing market prices, as reflected in the UB index, diverge sharply from actual market conditions, including fundamental supply-and-demand dynamics. As the leading industry commentator Simon M. Shane pointed out, reliance on a single commercial price discovery system

"constitutes an impediment to a free market." Here it allows Defendants, the largest-volume producers, to manipulate the market price.

73.     On January 12, 2023, Karyn Ripsoli, an analyst with Urner Barry and editor of Urner Barry's *Egg Price Current*, commented on high egg prices, which saw nine weeks of consecutive growth, saying that "the market is undergoing a correction… [b]ut given the heights from which we are adjusting, the declines have been rather precipitous. Over the past two weeks, prices have plummeted $1.13/dozen, or 20.7% (as of January 10). And based on negotiated trade values in the spot market, there's still quite a bit of adjusting that needs to take place."

74.     The fact that prices rose for nine straight weeks and then fell over 20% in two weeks implies that prices were pushed too high. Benchmark-driven pricing can be sticky, even after market conditions shift. The mention of spot trades being lower than the quoted benchmark suggests that Urner Barry's benchmark prices were artificial.

75.     Joe Maxwell, co-founder of Farm Action, a farmers' advocacy group, said "[w]e do not see the supply and demand numbers that justify the prices being charged" and "[t]he minute we see a market not responding the way it should, that's a flag for us to say, 'OK, what is going on here?' Because the market dynamics, the basic laws of economics, are not working."

76.     Defendants' conspiracy is further evidenced by the prices they paid to their contracted farmers. Farm Action, a farmers' advocacy group, obtained documentation from a farming family with a long-standing contract with Cal-Maine. The documentation revealed that Cal-Maine did not use the UB index as a benchmark for their own contract farmer payments. As a result, farmers were denied the opportunity to benefit from Cal-Maine's soaring profits. Despite the outbreak of avian flu, contract farmers received only a $0.0125 per dozen increase compared to six years ago.

77.     As of early 2025, farmers were paid $0.2675 per dozen eggs, while Cal-Maine and other defendants charged customers around $6 per dozen.

78.     The idea that the Urner Barry Index is subject to manipulation is not a new one. In a major antitrust case against broiler chicken producers by retailers like Kroger and Albertsons in 2017, the plaintiffs claimed that the defendants directly influenced Urner Barry's price calculations by submitting misleading or selective pricing data and pressuring a key executive at Urner Barry to raise prices. The case has led to over $280 million in settlements to date.

### c.   Prices Dropped Following the DOJ Investigation

79.     On March 7, 2025, it was announced that the U.S. Department of Justice Antitrust Division's Chicago office opened a preliminary investigation into whether companies including Defendants Cal-Maine and Rose Acre colluded to limit supply and/or boost prices of shell eggs.

80.     In the same month, Urner Barry reported that prices had dropped 54% in the prior 4 weeks, with the drop accelerating following the announcement of the DOJ investigation. Economist David Anderson noted that if prices could fall so rapidly and easily, they likely did not need to be that high in the first place—further reinforcing evidence of the Defendants' alleged conspiracy.

### 2.   Defendants Slowed the Restoration of Egg Production, Using AI as Pretext to Engineer a False Impression of Scarcity

81.     Defendants had relatively stable egg inventory throughout the Class Period and inflated the Urner Barry benchmark through coordinated reporting. However, Defendants were only able to pass off these high prices if they pushed the narrative that the Avian Flu was affecting egg prices.

82.     Prices have fluctuated wildly since the first infection of AI was detected in commercial flocks in February 2022. However, a deep dive into corporate filings and U.S.

Department of Agriculture data suggests that Defendants used the outbreak as a smokescreen for raising prices beyond what was necessary to cover costs. Overall, drops in egg production were not nearly as dramatic as Defendants suggest.



83. For example, the USDA noted early in the outbreak that the increases in prices outweighed the decreases in egg production. Additionally, USDA data shows that the monthly U.S. egg-laying flock in 2022 never fell more than 6.7 percent from the five-year average, and monthly egg production never fell more than 5.6 percent. Moreover, in the month preceding the first detection in commercial flocks, national retail egg inventories were 22 percent above the four-year average.

84. Per capita production of eggs in the U.S. has not dipped below per capita consumption of eggs in any year between 2022 and 2025. Despite narratives blaming bird flu shortages for price hikes, Cal-Maine remained free of bird flu until December 2023. In fact, from June 2022 to May 2023 it sold 7% more eggs compared to 2021.

18

85. An Urner Barry analyst hinted that the real reason for high prices is that Defendants are relying on the "psychology" of the public and their awareness of the flu outbreak, rather than economics, and are "confident about the value they can offer to the market."

86. When egg prices dropped to a five-month low in May 2025, Brett House, an economics professor at Columbia Business School, told CBS MoneyWatch that one of the main drivers behind the drop was an "abatement in the conversation about bird flu." Professor House added that "egg prices are still substantially higher than they were 12 months ago."

87. The U.S. egg industry has developed a well-established and efficient protocol for responding to AI outbreaks, based on prior experience. Once AI is confirmed by the appropriate authorities, the affected facility is immediately quarantined. A standardized response follows, involving depopulation of infected flocks, disposal of carcasses, thorough cleaning, and disinfection of the premises. Upon completion of these steps, the quarantine is lifted, allowing operations to resume with minimal delay. For example, at a facility impacted in March 2025, the timeline was as follows:

- March 12    Infection officially confirmed

- March 13    Depopulation of 47,653 hens completed

- March 20    Disposal completed

- April 2     Cleaning of the premises completed

- April 4     Disinfection of the premises completed

- April 20    Quarantine lifted

In this case, the producer was able to resume normal operations within approximately six weeks of the outbreak.

88. In a competitive market, when prices surge, producers have a strong incentive to ramp up production quickly. They want to capitalize on high prices before supply rebounds and

drives prices back down. This rapid response mechanism helps stabilize markets over time, as higher profits encourage more output, which eventually balances supply and demand.

89.     This pattern played out clearly during the 2014–2015 avian flu epidemic, when producers lost over 35 million hens to HPAI-related cullings but managed to fully replenish their flocks within eight months. Although the outbreak initially caused prices to rise due to supply shortages, the swift replenishment of flocks led to a rapid rebound in egg production, driving prices down sharply in 2016—to levels even lower than those before the epidemic.

90.     As Cal-Maine had stated, "[i]n the past, during periods of high profitability, shell egg producers have tended to increase the number of layers in production with a resulting increase in the supply of shell eggs, which generally has caused a drop in shell egg prices until supply and demand return to balance."

91.     In contrast, during the Class Period, Defendants conspired to limit the expansion of their egg-laying flocks, deliberately creating a false perception of an egg shortage. Their agreement to restrict output left the egg-laying flock struggling to return to its pre-outbreak size of approximately 330 million hens, despite persistently high prices.

92.     The slow recovery of flock size was not due to increased culling in the current outbreak but rather to Defendants' collective failure to meaningfully expand the placement of fertilized eggs in incubators and the hatching of chicks, leading to a stagnant supply of new egg-laying hens.

93.     Indeed, the monthly reduction in the egg-laying flock size since 2022 has been similar to those in 2015, when the HPAI destroyed 43 million-egg laying hens, yet prices since 2022 have risen more than three times more per hen loss than they did during the earlier outbreak.

94.     This time, rather than increasing pullets, Defendants have added in the

neighborhood of 20 million fewer pullets, despite the fact that breeders and hatchers are producing more fertilized eggs, and that costs have gone down significantly since 2022. This deliberate slowdown in restoring production runs counter to their individual economic interests and has contributed to a manufactured perception of egg scarcity.

### 3. Defendants' Public Excuses for High Egg Prices are Pretextual

### a. There Is No Severe Egg Shortage

95.     While avian flu has been cited by Defendants as the primary driver of skyrocketing egg prices, its actual impact on production has been minimal.

96.     Since the 2022 avian flu outbreak, around 144 million of hens have been culled or died due to the virus. It is true that if all 144 million hens, almost 40% of the national flock, were taken out all at once, there would be a meaningful impact.  However, the cullings have occurred over the course of 3+ years with as many as 11 months passing between outbreaks.



97.     An analysis of USDA inventory data shows that the average monthly size of the U.S. egg-laying hen flock—a widely accepted indicator of egg supply—declined only modestly following the bird flu outbreak. Compared to the corresponding months in 2021, the flock was, on

average, just 3.82% smaller in 2022, 3.16% smaller in 2023, and 5.18% smaller in 2024. In absolute terms, the effective reduction in 2022 amounted to approximately 3.5 million hens, representing only about a 1% decrease from 2021 levels. And yet, the national average wholesale prices in the same month-to-month comparison to 2021 rose 127% in 2022, 54.6% in 2023, and 127.7% in 2024.

98.     Moreover, the actual domestic egg supply fell even less than the flock size, due to a significant reduction in egg exports and an unprecedented increase in laying rate per hen, owing to improved genetics. As a result, egg production has only dropped slightly from 8.1 billion eggs per month in 2021 to 7.75 billion eggs per month in December 2024.

**b.      The Sharp Rise in Egg Prices since 2022 Cannot Be Blamed on Avian Flu or Other Economic Factors**

99.     The pretextual nature of the avian flue excuse is evident, as this is not the first time the United States egg industry has faced a massive HPAI outbreak. The last outbreak occurred in 2014. On December 11, 2014, AI was detected in captive wild birds and backyard flocks. The first infection at a commercial egg laying facility was reported on April 11, 2015, with the last being reported on June 16, 2015. As a consequence, in only a matter of months, 43 million egg-layers and pullets died or were depopulated.

100.    In each of 2022, 2023, and 2024, the number of layers culled were on par with or lower than the number of hens culled due to the 2014 Outbreak.

> 2015    43 million
>
> 2022    43.3 million
>
> 2023    12.8 million
>
> 2024    40 million
>
> 2025    28 million (thru mid-February)

101.    Turning to the price side of the equation, in 2015, egg prices increased 7.16% per 1% of flock decrease. As outlined above, these prices returned to normal within a year. By contrast, in 2022, prices increased 33% for each 1% reduction in flock size; in 2023 the increase was 17% and in 2024 the increase was 25%.



102.    The spike in U.S. egg prices becomes even more perplexing when contrasted with Europe, which experienced a severe supply shortage in 2022 after the depopulation of 50 million layers—compared to 43 million in the U.S. Despite this, European egg prices increased by only about 30% from January 2022 to January 2023, whereas U.S. prices surged nearly 170% over the same period.

103.    Despite a slight decline in production between 2022 and 2024, U.S. egg production per capita has consistently remained above the per capita consumption level throughout this period. Interestingly, while consumption trends have softened, the total value of egg production has surged dramatically—from $8.8 billion in 2021 to $19.4 billion in 2022, reaching $21 billion in 2024. In

other words, traditional supply and demand principles cannot explain Defendants' dramatic increases in egg prices during the Class Period.





104.    In addition, the costs of producing eggs are down. Feed costs make up roughly half of the production costs of egg producers. Another significant cost is natural gas. The prices for both of these have been declining since 2022.

105.    The CEO of Vital Farms (which produces pasture-raised and organic eggs) called the price increases by other egg producers during the first year of the bird flu outbreak a "head-scratcher." And while he did not outright accuse his competitors of price gouging, he stated, "I don't see anything in my cost structure that would have led me to raise our prices by as much as [reported]."

<h3>c.    The Regional Nature of Avian Flu</h3>

106.    The geographically limited impact of avian flu underscores the pretextual nature of egg producers' reliance on the outbreak to justify coordinated price increases. Notably, the Southeastern United States—including major egg-producing states such as Georgia, Alabama, and

Florida—did not report any confirmed HPAI outbreaks in commercial table egg flocks during the critical pricing window spanning 2022 through late 2024. Despite representing approximately 7% of national table egg production, the region increased output in both 2022 and 2023 compared to 2021 levels.

107.    USDA retail inventory data further confirms that the Southeast experienced no meaningful deviation from its five-year historical average during the period of elevated pricing. Inventory levels remained consistent with seasonal norms, indicating that supply was sufficient to meet consumer demand. These facts directly undermine any assertion that regional shortages contributed to the spike in retail egg prices.

108.    Nevertheless, retail egg prices in the Southeast rose sharply, reaching $2.99 per dozen in January 2023, well above the prior year's national average and equivalent to prices in regions directly affected by HPAI-related production disruptions. This pricing behavior cannot be explained by local market conditions and instead suggests a coordinated pricing strategy among egg producers.

109.    In addition, there is no evidence that the Southeast faced disproportionate increases in feed costs, labor constraints, or transportation disruptions during this period. Absent such cost pressures, the elevated prices appear disconnected from the actual cost of production and distribution.

110.    The Southeast's egg prices demonstrate that egg pricing during the relevant period was not responsive to regional supply and demand dynamics. Rather, it reflects a pattern of price manipulation by Defendants, the dominant producers in the United State, who exploited the UB index to enforce uniform, supra-competitive prices across the nation-wide egg market, including those regions with no confirmed HPAI impact.

**F.     Defendants' Conspiracy Allowed Them to Derive Huge Profits**

111.    As a result of Defendants' conspiracy, Defendants have experienced a dramatic increase in profit margins.

112.    Reports indicate that while Cal-Maine Foods has maintained its sales volume, its profit margins have surged, with multiple quarters of gross profits surpassing previous full-year totals. Prior to the avian flu outbreak, Cal-Maine reported gross profits of $179.6 million in FY20 (June 2019–June 2020) and $160.7 million in FY21 (June 2020–June 2021), while annual egg production remained steady at around 1.1 billion dozen eggs.

113.    Following the 2022 avian flu epidemic, however, Cal-Maine's profits skyrocketed, reaching $1.2 billion in FY23 (June 2022–June 2023) and $541.6 million in FY24 (June 2023–June 2024), with sales remaining stable at approximately 1.1 billion dozen eggs per year. The trend has continued into FY25, with Q1 and Q2 gross profits reported at $247.2 million and $356.0 million, respectively.  Overall, Cal-Maine's quarterly profits have been up an average of 948% since the AF epidemic began in 2022, and the company's stock price is up over 100%.



114.     Although Cal-Maine is the only publicly traded company among the Defendants, information suggests that all Defendants experienced significantly higher profit margins during the class period. The unprecedented profit surge—despite industry claims of struggles due to the avian flu—strongly indicates that price increases were not driven by supply constraints but rather by the Defendants' ability, as dominant producers in the U.S. market, to manipulate prices at the expense of their customers.

**G.     Plus Factors Corroborate Defendants' Conspiracy to Fix Shell Egg Prices**

115.     Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, which are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action, and support an inference of a conspiracy. Indeed, detecting a cartel is much like diagnosing whether a disease is present. The plus factors are symptoms that can make the diagnosis more reliable.

116.     In addition to the ongoing DOJ investigation, the plus factors that support the

28

existence of a conspiracy here also include: (1) each Defendant acting against its unilateral self-interest; (2) a consolidated industry; (3) Defendants' opportunities to conspire; (4) a market characterized by high barriers to entry; (5) price inelasticity; (6) eggs are interchangeable products; and (7) Defendants are recidivist antitrust violators.

### 1. Defendants' Acted Against Their Unilateral Self-Interest

117. Defendants' actions during the relevant period exemplify conduct that defies rational behavior in a competitive market, underscoring the presence of coordinated restraint rather than independent decision-making.

118. First, no individual producer Defendant acting alone could meaningfully influence the Urner Barry Index, the industry's primary pricing benchmark. The index is constructed from aggregated market data, and any single producer reporting prices that deviate significantly from prevailing market conditions risks damaging their credibility. Such divergence could result in exclusion from future reporting, effectively severing access to a critical pricing tool relied upon for contract negotiations and market positioning. This risk makes unilateral price inflation irrational and self-defeating.

119. Second, in a truly competitive environment, producers have a strong incentive to rapidly increase output when prices surge, and profit margins expand. The economic logic is straightforward: producers seek to capitalize on elevated prices before competitors respond, triggering a supply rebound that drives prices back down. Historically, this dynamic has led to swift production recoveries following supply shocks caused by avian flu. However, in this instance, Defendants collectively slowed the restoration of production, despite favorable conditions and declining costs. Such restraint only yields sustained high prices if all major producers refrain from expanding output—an outcome that requires mutual assurance that no one will break ranks to gain market share. This coordinated behavior is fundamentally at odds with

individual self-interest and can only be explained by a shared understanding among Defendants to suppress competition and maintain artificially high prices.

### 2. The Egg Market Is Highly Concentrated

120. Defendants are the leading egg producers in the U.S. egg market, collectively controlling nearly 40% of the market. Cal-Maine, is the largest egg producer in the U.S. market, producing more than 1 of every 5 eggs consumed in the US.

121. The consolidation of the egg market follows decades of mergers and acquisitions of smaller farms by the largest egg producers. Cal-Maine has completed 25 acquisitions since 1989. Since 2023, Cal-Maine has acquired two separate assets — ISE America Inc. and Fassio Farms, adding 4.7 million and 1.2 million layers, respectively, to its flock. Rose Acre Farms broke ground in 2023 on a new $100 farm in Arizona to operate 2.2 million cage-free hens and announced in 2024 that it was in the process of adding cage-free farms in Indiana to house 1.2 million to 1.3 million hens. Daybreak Foods, ranked fourth-largest, acquired two operations—Hen Haven LLC and Schipper Eggs LLC—in 2023.

122. The top five egg companies own 46% of all U.S. laying hens, and the largest, Cal-Maine, has 75% more hens than its largest competitor and controls about 20% of the market. These companies get their eggs from fewer, larger farms. The number of egg producers in the U.S. declined from 2,500 in 1986 to just 700 in 2002. In 1982 half of all egg-laying hens lived on farms with 62,000 hens or less. By 2012, half of all hens lived on farms with 925,000 hens or more.

123. Consolidation benefits the largest players, *viz*, the Defendants. For instance, Cal-Maine's net profit skyrocketed from just $18 million in 2020 to $785 million in 2023 and $278 million in 2024, due to its influence on market prices.

### 3. Defendants Have Numerous Opportunities to Collude

124. Courts have found that industries in which competitors participate in trade

associations, joint ventures, and frequently communicate with each other are susceptible to collusion because these contacts provide forums for the conspirators to exchange sensitive information such as pricing and outputs.

125. Defendants are all members of United Egg Producers ("UEP"), the preeminent national trade association for the egg industry. Since its founding in 1968, UEP's brazen mission was to "stabilize" egg prices by controlling production.

126. Not only are Defendants members of UEP, since the early 2000s, Defendants have dominated its leadership. It began with Defendant Cal-Maine taking an active role once it gained market dominance. Then in 2002, after having avoided membership for over 30 years, Defendant Rose Acre not only became a member, its CEO, David Rust, took a seat on the Board so that he would have a say in what was being done. The collusive and anti-competitive activity being "done" at that time was well documented in the recent *Kraft* case.

127. The "work" of the UEP is conducted through boards and committees, the meetings of which are restricted to members only. With all the major stakeholders at the table, these meetings provide the perfect opportunity to collude and exchange confidential information.

128. For example, the UEP recently successfully lobbied the USDA for increases to the payments made to egg producers under the Animal Health Protection Act. To be able to advocate for a payment formula equitable across multiple producers, the committee members presumably had to compile, exchange and review competitively sensitive information. Cal-Maine and Rose Acre executives represented the UEP in these efforts.

129. Although UEP is the largest, there are multiple smaller organizations that present opportunities to collude. For example, the World Egg Organization (WEO) hosts an annual Global Leadership Conference. At this year's conference, held in Cartagena, Columbia, Marcus Rust of

Defendant Rose Acre Farms was named WEO International Egg Person of the Year.

### 4. The Conventional Egg Industry Has High Barriers to Entry

130.    Any potential entrant into commercial high volume egg production faces significant entry and exit barriers, a characteristic that leads to further market concentration. Barriers to entry include large up-front capital investments to either purchase existing facilities or start new ones of sufficient scale.

131.    In 2013, the USDA published the Poultry Industry Manual: The Foreign Animal Disease Preparedness and Response Plan (FAD PReP)/National Animal Health Emergency Management System (NAHEMS) Guidelines. The report describes the high capital investment required to go into egg production as follows:

> A typical Midwest multi-age, in-line egg production facility contains 1.5 to 4.0 million laying hens. With a 75% average rate of lay and eggs priced at $0.95 per dozen, 1.25 to 3.0 million eggs produced each day have a market value of $98,960 to $237,500. Typical modern in-line egg production operations in the Midwest may have chickens in cages with 67 square inches per bird, grading and packing equipment, egg-breaking machines to produce liquid whole eggs, and rooms for packing, cooling, and storing eggs. Capital investment for this type of facility ranges from $24 million for an operation with 1 million chickens ($24/hen) to $80 million for a 4 million bird complex ($20/hen).

132.    These numbers aren't just hypothetical.  In May 2023, Rose Acre broke ground on a new farm in Arizona, which is projected to cost $100 million.

133.    In March 2022, Cal-Maine announced it was expanding its cage free facilities at two of its farms at an estimated cost of $82M.  In 2023, it acquired Fasio Egg Farms for an estimated cost of $54-$67M. A year later, Cal-Maine spent $110M to acquire the operations of ISE America (the 23rd largest producer), including capacity for 4.7M hens.

134.    When a market is protected by high barriers to entry and exit, conspirators are better able to fix a high price with less worry that new firms will come into the market and bid the price down. Because of these high barriers to entry and exit, the egg producing industry is more

conducive to collusion.

### 5. Conventional Eggs Have Inelastic Demand

135.    The price elasticity of demand refers to the relationship between the price and demand for a good. Where consumers will purchase as much as they need of a product regardless of price, demand is considered inelastic. A market with inelastic demand is more susceptible to collusion and price-fixing because competitors can raise their prices without suffering a significant decrease in sales or profit.

136.    Demand for eggs generally is inelastic—i.e., demand generally remains stable (or increases) when prices increase.  The inelasticity of demand for eggs is widely acknowledged by industry insiders.  UEP president Gene Gregory told Egg Industry magazine in February 2007, "[w]hether eggs are 39 cents or $1.25 per dozen, customer purchases are the same." More recently, Defendants acknowledged that a very small change in actual or perceived supply of eggs can cause a disproportionately large change in egg prices.

137.    The U.S. egg market presents fertile ground for collusion due to persistently inelastic consumer demand.  Agricultural economist Jada Thompson explained that "[w]e demand eggs. Think about all those egg processers that are making breads. I still buy my bread. They still have to make bread. In order to make the bread, they need eggs. In order to buy those eggs, there's a low supply, so they're going to keep bidding until they get those eggs."

138.    Therefore, according to Jada Thompson, "Cal-Maine or any other company that is able to sell eggs during periods of high price are going to basically win out [as] they get additional prices because they have the only supply that exists."

139.    Furthermore, there is no cross-elasticity of demand because there are no effective substitutes for eggs.  According to research conducted by the American Egg Board, "[e]ggs possess unique nutritional properties and contribute desirable functional attributes unequaled by any single

egg alternative." Consequently, buyers will not be induced to buy more or fewer eggs through price changes. Because the demand for eggs is highly inelastic, Defendants were able to collectively raise prices to supra-competitive levels without losing revenue.

### 6. Conventional Eggs Have a High Degree of Interchangeability

140. When products are interchangeable, the primary way manufacturers compete is on price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products. Where a product is interchangeable, economics suggests that cartel behavior is facilitated because, amongst other things, cartel members can more easily monitor and detect defections from a price-fixing agreement.

141. Shell eggs are commodity products. In most instances, eggs are homogenous and fungible products with no qualitative or other factors that differentiate one producer's eggs from those of any other producer. There also is little if any advertising or promotion to create any brand or other product identity. Instead, the focus is on the commodity: for example, the long-running American Egg Board's "the Incredible, Edible Egg" campaign.

### 7. Defendants are Recidivist Antitrust Violators

142. The Defendants have a history of anti-competitive behavior.

143. In 2011, major food manufacturers, including Kraft Foods Global, Inc. and The Kellogg Company, filed a lawsuit against leading egg producers, including Cal-Maine and Rose Acre Farms, accusing them of restricting the U.S. domestic egg supply to artificially inflate prices throughout the 2000s. In 2023, a federal jury found Cal-Maine and Rose Acre Farms liable for engaging in a price-fixing scheme from 2004 to 2008, violating federal antitrust law. *See Kraft Foods Glob., Inc. v. United Egg Producers, Inc*., No. 11-CV-8808, 2024 WL 4346418, at *1 (N.D. Ill. Sept. 30, 2024) (Seeger, J.).

144.    This isn't the first time Cal-Maine has allegedly used its power to profit from disaster. A complaint filed by the State of Texas accused Cal-Maine of price gouging at the start of the COVID-19 pandemic. Texas's attorney general claimed that the company tripled prices without experiencing any shortage or supply chain disruptions.

145.    Similarly, on August 11, 2020, New York State Attorney General 's office filed a lawsuit against Hillandale Farms, accusing the company of price gouging during the COVID-19 pandemic. In the case, James highlighted that Urner Barry's indices function as a feedback loop, allowing egg producers like Hillandale Farms to cite those indexed prices as justification for imposing unconscionably excessive prices during a time of crisis. Hillandale Farms settled that case the next year by promising to no longer engage in price gouging and donating 1.2 million eggs to food banks.

## ANTICOMPETITIVE EFFECTS

146.    Defendants' anticompetitive conduct had the following effects, among others: (a) competition among the Defendants has been restrained with respect to egg prices; (b) the price of eggs has been fixed, stabilized, or maintained at artificially high levels; and (c) purchasers of eggs, including Plaintiff and the Class, have been deprived of the benefit of free and open competition.

147.    Defendants' violations of the antitrust laws have caused Plaintiff and the Class to pay higher prices for eggs than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiff and members of the Class have suffered damages in the form of paying supra-competitive prices for eggs in the United States. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing conspiracy is *per se* unlawful.

## CLASS ACTION ALLEGATIONS

148.    Plaintiff brings this lawsuit under Fed. Civ. P. 23(a), (b)(2) and (b)(3) as

representatives of the following class (the "Class"):

> All persons and entities in the United States and its territories who purchased Conventional Eggs directly from any of the Defendants or their subsidiaries or affiliates during the period at least as early as January 1, 2022 until the effects of the conspiracy ceased.

149.    Excluded from the Class are (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) all jurors assigned to this case; (3) Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defendants' counsel.

150.    Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

151.    Numerosity: The Class is so numerous as to make joinder impracticable. The exact number of Class members is unknown to Plaintiff, as this information is currently within the exclusive possession of Defendants. However, due to the nature of the egg industry, Plaintiff reasonably estimates that there are at least thousands of Class members across the United States and its territories.

152.    Commonality and Predominance: Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Plaintiff and the class were injured by the same unlawful conspiracy to fix prices, and Defendants' anticompetitive conduct was generally applicable to all the members of the class, and relief to the class as a whole is appropriate. Questions common to the Class include, but are not limited to:

a) Whether Defendants combined and/or conspired to fix, raise, maintain, or stabilize egg prices at any time during the Class Period;

b) Whether Defendants fixed, raised, maintained or stabilized egg prices sold to purchasers at any time during the Class Period, or committed other conduct in furtherance of the conspiracy alleged herein;

c) Whether Defendants engaged in conduct that violated Section 1 of the Sherman Act;

d) Whether Defendants' conduct caused the prices of eggs sold directly to Plaintiff and other members of the Class to be higher than the prices that would have prevailed in a competitive market as a result of their restraint of trade;

e) Whether Plaintiff and other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Class wide measure of damages; and

f) Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

153. Typicality: Plaintiff's claims are typical of the claims of Class members in that Plaintiff, like all Class members, have been injured by Defendants' misconduct — contracting, combining, or conspiring to fix, maintain, or raise the prices of eggs.

154. Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including antitrust class actions. Plaintiff does not have any interests antagonistic to those of the Class.

155. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendants to comply with federal and state law. Moreover, because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of Defendants' financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides

the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

156. Injunctive relief: Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## CLAIM FOR RELIEF

**Violation of the Sherman Act, 15 U.S.C. § 1**
**(Against All Defendants)**

157. Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

158. Defendants entered into and engaged in a continuing contract, combination, or conspiracy in restraint of trade or commerce in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by agreeing with each other and with co-conspirators to fix, raise, stabilize, or maintain Conventional Egg prices at artificially high levels. Defendants and co-conspirators in fact fixed, raised, stabilized, and maintained Conventional Egg prices at artificially high levels. Plaintiff and members of the Class directly paid artificially high Conventional Egg prices to Defendants and egg producer co-conspirators.

159. Defendants' activities constitute a *per se* violation of Section 1 of the Sherman Act.

160. Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by restraining competition and thereby raising, maintaining, and/or stabilizing Conventional Egg prices at levels above the prices that would have prevailed in a competitive market.

161. For this violation of Section 1 of the Sherman Antitrust Act, Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

A.      Certify this case as a class action, and appoint Plaintiff as Class representative and the undersigned attorneys as Class Counsel;

B.      Enter judgment in favor of Plaintiff and the Class;

C.      Award all damages to which Plaintiff and Class members are entitled, including treble damages under the Clayton Act;

D.      Award Plaintiff and Class members pre- and post-judgment interest as provided by law;

E.      Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and Class members, including enjoining and restraining Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      Award Plaintiff and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

G.      Award such other and further relief as the Court deems necessary and appropriate.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues triable as of right.

DATED: November 14, 2025

By : */s/ Peter A. Barile III*
Vincent Briganti
Raymond P. Girnys
Peter A. Barile III (ADRC No. 4364295)
Peter Demato
Nicole A. Veno
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Phone: (914) 997-0500
vbriganti@lowey.com
rgirnys@lowey.com
pbarile@lowey.com
pdemato@lowey.com
nveno@lowey.com

Christopher M. Burke
Amelia Burroughs
Yifan (Kate) Lv
Robin Stemen
**BURKE LLP**
402 West Broadway, Suite 1890
San Diego, CA 92101
Phone: (619) 369-8244
cburke@burke.law
aburroughs@burke.law
klv@burke.law
rsteman@burke.law

Marco Cercone
Nicholas A. Vona
**RUPP PFALZGRAF LLC**
1600 Liberty Building
424 Main Street
Buffalo, NY 14202
Telephone: (716) 854-3400
Facsimile: (716) 332-0336
cercone@rupppfalzgraf.com
vona@rupppfalzgraf.com

Amanda M. Williams
Daniel R. Olson
**BASSFORD REMELE P.A.**
100 South Fifth Street, Suite 1500
Minneapolis, MN 55402

Telephone: (612) 333-3000
Facsimile: (612) 333-8829
awilliams@bassford.com
dolson@bassford.com